# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01935

**ORAL ARGUMENT REQUESTED**

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
Amy Belsher
Robert Hodgson
Veronica Salama
Molly Biklen
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org

*Pro hac vice application forthcoming

(Additional Counsel on next page)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Omar Jadwat
Noor Zafar
Sidra Mahfooz*
Brian Hauss
Brett Max Kaufman
Esha Bhandari
Vera Eidelman
Tyler Takemoto*
125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500
ojadwat@aclu.org

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Mudassar Hayat Toppa
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805
Fax: (212) 571-3792
agreer@dratellewis.com

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

WASHINGTON SQUARE LEGAL SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das, Esq.
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu

*Counsels for Petitioner*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    Mr. Khalil engages in protected speech. ...................................................................... 2

    The Respondents retaliate against Mr. Khalil's protected speech pursuant to the Policy. ......... 3

    Without injunctive relief, Mr. Khalil remains detained, his speech chilled, and experiencing

        multiple irreparable harms. ................................................................................ 5

ARGUMENT .................................................................................................................... 6

    I.     PETITIONER IS LIKELY TO SUCCEED ON THE MERITS......................................... 6

        A.    The Rubio Determination and the Policy are retaliatory, viewpoint discriminatory, and

            void for vagueness. ...................................................................................... 6

          1.    The Rubio Determination is retaliatory in violation of the First Amendment............ 6

          2.    Respondents' Policy constitutes an unconstitutional, viewpoint-based restriction. . 11

          3.    The Policy and Determination as to Petitioner are void for vagueness. ................... 15

        B.    Mr. Khalil's retaliatory detention violates due process and the First Amendment. ..... 19

    II.    PETITIONER FACES IRREPARABLE HARM ABSENT AN INJUNCTION............ 22

    III.    THE EQUITIES WEIGH HEAVILY IN THE PETITIONER'S FAVOR AND A

        PRELMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST. .............. 24

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**................................................................................................................Page(s)

*Agudath Israel of America v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020)...........................................................................6

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
    525 U.S. 471 (1999)......................................................................................13

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ......................................................................13

*Arriaga v. Mukasey,*
    521 F.3d 219 (2d Cir. 2008)....................................................................18, 19

*Barker v. Wingo*,
    407 U.S. 514 (1972)......................................................................................21

*Bell v. Wolfish*,
    441 U.S. 520 (1979)......................................................................................20

*Bello-Reyes v. Gaynor*,
    985 F.3d 696 (9th Cir. 2021) .................................................................10, 13

*Black v. Decker*,
    103 F.4th 133 (2d Cir. 2024) ......................................................................19

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002) ....................................................................16

*Boos v. Barry*,
    485 U.S. 312 (1988)......................................................................................15

*Borjas-Calix v. Sessions*,
    No. 16-CV-685, 2017 WL 1491629 (D. Ariz. Apr. 26, 2017) .........................23

*Bridges v. Wixon*,
    326 U.S. 135 (1945)...............................................................................7, 8, 13

*Bronx Household of Faith v. Bd. of Educ.*,
    331 F.3d 342 (2d Cir. 2003)...........................................................................22

*City of Chicago v. Morales*,
527 U.S. 41 (1999)..................................................................................16, 19

*City of Houston v. Hill*,
482 U.S. 451 (1987)........................................................................................20

*City of Lakewood v. Plain Dealer Publishing Co.*,
486 U.S. 750 (1988)........................................................................................19

*Coronel v. Decker*,
449 F. Supp. 3d 274 (S.D.N.Y. Mar. 27, 2020)............................................24

*Coscarelli v. ESquared Hosp. LLC*,
364 F. Supp. 3d 207 (S.D.N.Y. 2019)...........................................................22

*Demore v. Kim*,
538 U.S. 510 (2003)........................................................................................20

*Dorsett v. Cty. of Nassau*,
732 F.3d 157 (2d Cir. 2013)............................................................................7

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................22

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)..........................................................................22

*Faure v. Decker*,
No. 15-cv-5128, 2015 WL 6143801 (S.D.N.Y. Oct. 19, 2015)....................20

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)........................................................................................16

*Fong Yue Ting v. United States*,
149 U.S. 698 (1893)........................................................................................10

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991)........................................................................................7

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)........................................................................................15

*Gutierrez-Soto v. Sessions*,
317 F. Supp. 3d 917 (W.D. Tex. 2018)..........................................................10

iii

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)................................................................................13, 16

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)....................................................................................15

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018)..................................................................................13

*Jimenez v. Napolitano*,
    No. C-12-03558, 2012 WL 3144026 (N.D. Cal. Aug. 1, 2012) ........................23

*Joint Anti-Fascist Refugee Committee v. McGrath*,
    341 U.S. 123 (1951)..................................................................................11

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996).........................................................................22

*Kamerling v. Massanari*,
    295 F.3d 206 (2d Cir. 2002).......................................................................22

*Kansas v. Crane*,
    534 U.S. 407 (2002)..................................................................................20

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018).........................................................24

*Lee v. United States*,
    582 U.S. 357 (2017)..................................................................................16

*Matal v. Tam*,
    582 U.S. 218 (2017)..............................................................................8, 14

*Meyer v. Grant*,
    486 U.S. 414 (1988)...................................................................................7

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013)....................................................................6, 25

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964).............................................................................10, 14

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)........................................................................6

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)................................................................................................10, 16

*Parcham v. INS,*
    769 F.2d 1001 (4th Cir. 1985) ..............................................................................7

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *cert. granted, judgment vacated on other grounds*
    *sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020) ..................................... *passim*

*Rauser v. Horn*,
    241 F.3d 330 (3d Cir. 2001)..................................................................................21

*Reno v. ACLU*,
    521 U.S. 844 (1997)..............................................................................................16

*Reno v. Flores*,
    507 U.S. 292 (1993)..............................................................................................19

*Rosales-Mireles v. United States*,
    138 S. Ct. 1897 (2018)..........................................................................................23

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..................................................................................8, 12, 18

*Roth v. United States*,
    354 U.S. 476 (1957)..............................................................................................10

*Sajous v. Decker*,
    18-CV-2447, 2018 WL 2357266 (S.D.N.Y. May 23, 2013) .......................................23, 24

*Sindicato Puertorriqueno de Trabajadores v. Fortuño*,
    699 F.3d 1 (1st Cir. 2012)......................................................................................25

*Smith v. Campbell*,
    782 F.3d 93 (2d Cir. 2015)................................................................................7, 8

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..........................................................................................7, 14

*Street v. New York*,
    394 U.S. 576 (1969)..............................................................................................14

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*,
    2024 WL 4631301 (W.D. Tex. Oct. 28, 2024) ....................................................9

*Terminiello v. Chicago*,
    337 U.S. 1 (1949) ...................................................................................................14

*Texas v. Johnson*,
    491 U.S. 397 (1989) ...............................................................................................14

*United States v. Loy*,
    237 F.3d 251 (3d Cir. 2001) ...................................................................................18

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) ...........................................................................17, 18

*Velasco Lopez v. Decker*,
    978 F.3d 842 (2020) ..........................................................................................20, 21

*Velesaca v. Decker*,
    458 F. Supp. 3d 224 (S.D.N.Y. 2020) ....................................................................23

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018) .....................................................................................12

*West Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...............................................................................................13

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ...............................................................................................15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..........................................................................................19, 20

**Statutes, Rules and Regulations**

8 U.S.C. § 1182(a)(3)(C)(iii) .............................................................................................4

8 U.S.C. § 1226(a) ...........................................................................................................20

8 U.S.C. 1252(g) ..............................................................................................................13

Exec. Order 13899, *Combating Anti-Semitism*,
    84 Fed. Reg. 68779 (Dec. 11, 2019) ........................................................................9

Exec. Order 14188, *Additional Measures to Combat Anti-Semitism*,
    90 Fed. Reg. 8847 (Jan. 29, 2025) ...........................................................................9

H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990) ........................................4

Immigration and Nationality Act § 237(a)(4)(C)(i) ...............................................4

S. Rep. No. 100–75, 100th Cong., 1st Sess. (1987) ...............................................4

**Other Authorities**

@DHSgov, X (Mar. 9, 2025, 9:29 PM) ...........................................................17

@marcorubio, X (Mar. 9, 2025, 6:10 PM) .....................................................16

ACLU et. al, *Inside the Black Hole: Systemic Human Rights Abuses Against Immigrants
      Detained & Disappeared in Louisiana*, (Aug. 2024) https://perma.cc/HT6Z-SRCY. .....21

Amanda Friedman, "*Rubio Defends Detainment of Columbia Activist, Says More Arrests Will
      Come,*" Politico (Mar. 16, 2025) ......................................................5

Jake Offenhartz, *Immigration Agents Arrest Palestinian Activist Who Helped Lead Columbia
      University Protests*, Associated Press (Mar. 9, 2025) ......................................17

Luis Ferré-Sadurní & Hamed Aleaziz, "How a Columbia Student Fled to Canada After ICE
      Came Looking for Her," N.Y. Times (Mar. 15, 2025) ......................................5

## INTRODUCTION

Petitioner Mahmoud Khalil seeks preliminary relief to halt an extraordinary and unprecedented assault on his constitutionally protected freedom of speech—namely, his expressive activity in support of Palestinian human rights, his criticism of Israel and its military actions in Gaza, and his opposition to U.S. support of those actions. Mr. Khalil is a beloved husband, soon-to-be father, recent graduate student, and Palestinian rights activist. In retaliation for his speech on a matter of urgent public concern, Respondents have detained him, silenced him, transferred him more than a thousand miles from his family, and are seeking to deport him.

Respondents have done so pursuant to a policy to arrest, detain, and seek the removal of noncitizens who engage in protected expressive activity in support of Palestinian rights or critical of Israel, including by making a determination that their presence in the United States would have "serious adverse foreign policy consequences." The scope of this policy is breathtaking: President Donald Trump and Secretary of State Marco Rubio could apply it to any pro-Palestine speech by any noncitizen. And the policy provides no notice as to what specific statements might subject noncitizens to this unprecedented determination. Respondents' actions have an immediate and palpable chilling effect on political debate on a topic of ongoing international concern. Many noncitizens across the country—including lawful permanent residents like Mr. Khalil—now live in fear that they will be next if their actual or imputed speech brings them into the crosshairs of this administration, and many are choosing to stay silent going forward.

In this motion, Mr. Khalil moves for preliminary relief on his First Amendment and due process claims. Each of the preliminary injunction factors weighs strongly in Mr. Khalil's favor. First, he is likely to succeed on the merits of these claims because the policy and determination are retaliatory, viewpoint discriminatory, and void for vagueness, and his detention is unjustified.

1

Second, without preliminary relief Mr. Khalil is suffering numerous irreparable harms including the loss of his freedom, the possible loss of his right to remain in this country, a profound silencing of his deeply held beliefs, disruption in his medical care, loss of future employment, separation from his U.S. citizen wife, and the prospect of missing the birth of his first child. And finally, on the equities, unless this Court enjoins the government's unlawful and retaliatory policy and determination, this harm—and the suppression of disfavored speech—will continue to grow for Mr. Khalil and others subject to the policy during the pendency of this action.

For all these reasons, the Court should issue an order releasing Mr. Khalil, vacating Respondent Rubio's determination that the INA's "Foreign Policy Ground" applies to him, and enjoining Respondents from enforcing their unlawful policy for the pendency of this proceeding.

## BACKGROUND

A summary of the facts most relevant to this motion is below.[1]

**Mr. Khalil engages in protected speech.** Mr. Khalil is a Palestinian, a recent Columbia graduate student living with his wife—a United States citizen expecting the couple's first child next month—and a Lawful Permanent Resident. Declaration of Noor Ramez Abdalla ("Abdalla Decl."), ECF 59, at ¶¶ 4–11. Mr. Khalil is committed to peaceful protest. He has been an outspoken advocate for Palestinian human rights, and he has called Israel's actions in Gaza a genocide and characterized the United States as financing and facilitating such violence. *See id.* ¶ 22. Mr. Khalil's prominence as a leading student activist, along with Columbia University's position as a national focal point of student protests, have propelled him into the public eye. He's spoken with national and international news media regarding international law, the obligations the U.S. and

---

[1] A more fulsome treatment of the facts in this case is in the amended petition, ECF 38, and the memoranda in support of the Motion for Release(Mar. 14, 2025), ECF 53, and Opposition to the Government's Motion to Dismiss or Transfer (Mar. 14, 2025), ECF 50. Mr. Khalil has verified that the facts of his amended petition are true. *See* Declaration of Veronica Salama (Mar. 14, 2025), ECF 50-1.

Columbia have under that law, and the human rights of Palestinian people. *Id.* ¶¶ 26–27.

**The Respondents retaliate against Mr. Khalil's protected speech pursuant to the Policy.** In response to the speech of Mr. Khalil and others who share his views, the government announced a policy (the "Policy") to arrest, detain, and seek to remove noncitizens who engage in expressive activities in the United States supporting Palestinian rights. *See id.* ¶¶ 29–44. Most notably, the Trump Administration has clearly stated that it is targeting constitutionally protected speech, not unlawful conduct, in an effort to suppress one side of an ongoing political debate. For example, President Trump posted that Mr. Khalil's arrest was "the first arrest of many to come," declaring the Administration would not tolerate "students at Columbia and other universities . . . who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country." *Id.* ¶ 73.[2] And Secretary of State Rubio has stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." *Id.* ¶ 75.[3]

Pursuant to the Policy, on March 8, 2025, Respondents arrested Mr. Khalil, took him into Immigration and Customs Enforcement ("ICE") custody, and notified him that "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States," in a document citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground"), and further stating "the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the

---

[2] *Also available at* https://perma.cc/BML5-GR84.
[3] *Also available at* https://perma.cc/PJ2C-FHFD.

United States." Am. Pet. ¶¶ 81–82.[4] For Mr. Khalil, the events of the night of the arrest were swift, terrifying, and unusual. He recalls an ICE agent saying within earshot that "the White House [wa]s requesting an update" on him. *Id.* ¶ 58; *see also id.* ¶¶ 45–72.

Secretary Rubio's determination (the "Rubio Determination") was specifically motivated by Mr. Khalil's constitutionally protected speech. Indeed, on March 10, the Department of Homeland Security ("DHS") posted an official statement on social media stating ICE carried out Mr. Khalil's arrest "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State," *Id.* ¶ 76,[5] and the White House Press Secretary asserted his arrest was for "siding with terrorists," *id.* ¶79.[6] Even if such allegations were true— and they are not[7]—these statements evince the purpose behind Mr. Khalil's detention: to punish him for his perceived political viewpoints. And as discussed further below, regardless of how the government might characterize Mr. Khalil's expression, it is protected by the First Amendment.

The Policy's future application has been clearly outlined. On March 10, a White House official confirmed that the federal government's basis for arresting Mr. Khalil was a "blueprint"

---

[4] Notably, this statute states that a noncitizen may not be removed "because of [the individual's] past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States." 8 U.S.C. § 1182(a)(3)(C)(iii). While the Secretary of State can overcome the prohibition on speech-based removals if he "personally determines that the alien's [presence] would compromise a compelling United States foreign policy interest," *id.*, in enacting this ground for removal Congress made clear that, consistent with the requirements of the First Amendment and Due Process, it did not and could not grant the executive branch authority to deport noncitizens for protected political speech disfavored by the government. To the contrary, Congress explained its motivation as *preventing* such speech suppression: "For many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987). Therefore, in the parallel provision regarding admissibility, Congress amended the INA "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States." *Id. See also* H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990) (the exception is to be interpreted "as a significantly higher standard than the general potential for serious adverse foreign policy consequences," is meant to "be used only in unusual circumstances," and should be invoked "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies").

[5] *Also available at*: https://perma.cc/2BYW-9G84.

[6] *Also available at*: https://perma.cc/565D-2K5G (timestamp 10:16).

[7] *See generally* ECF56-6 (Mahmoud Khalil support letters).

for investigating other students. *Id.* ¶ 77. And on March 13, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that Mr. Khalil was "put[ting] himself in the middle of the process of basically pro-Palestinian activity." *Id.* ¶ 81. When asked if "any criticism of the Israeli government," "any criticism of the United States," "any criticism of the government" or "protesting" are deportable offenses, Deputy Secretary Edgar did not provide a direct answer. Instead, Edgar stated that if, when Mr. Khalil applied for a student visa, he had admitted an intention to "go and protest," "we would have never let him into the country." *Id.*[8] On March 16, Secretary Rubio reiterated that the government targeted Mr. Khalil, and will continue to target other students, for participating in "pro-Hamas events."[9] Indeed, pursuant to the Policy, the Administration appears to be targeting noncitizen students for deportation simply for "liking or sharing posts that highlighted 'human rights violations' in the war in Gaza," signing "open letters related to the war," and "call[ing] for 'Palestinian liberation.'"[10]

**Without injunctive relief, Mr. Khalil remains detained, his speech chilled, and experiencing multiple irreparable harms.** As described more fully below, *see infra* Section II, Mr. Khalil is currently in ICE custody in Louisiana, more than 1,000 miles from his eight-months-pregnant wife, terrified for her well-being without him as she faces an onslaught of harassment and national attention caused by the Rubio Determination. *See* Am. Pet. ¶¶ 73–81; Abdalla Decl. ¶¶ 28–29. He cannot engage in the protected speech for which he was targeted; his immigration status is at risk; and his liberty has been taken away unlawfully. *See also generally* Mem. in

---

[8] *Also available at*: https://perma.cc/6YZD-NK3Q.
[9] Salama Decl. Ex. A, Amanda Friedman, *Rubio Defends Detainment of Columbia Activist, Says More Arrests Will Come*, Politico (Mar. 16, 2025), *also available at* https://perma.cc/U3DR-KCPL.
[10] Salama Decl. Ex. B, Luis Ferré-Sadurní & Hamed Aleaziz , *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), *also available at* https://perma.cc/3YH3-5U5K.

Support of Mot. for Release, ECF 53. For all these reasons, he now moves for preliminary relief.

**ARGUMENT**

Petitioner seeks preliminary relief that, for the pendency of this litigation: (1) orders his release; (2) vacates the Rubio Determination as to him; and (3) enjoins Respondents from enforcing their Policy of arresting, detaining, and removing noncitizens who engage in speech in the United States supporting Palestinian rights or critical of Israel.

To obtain relief, the party seeking a preliminary injunction "must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted). "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

## I.   PETITIONER IS LIKELY TO SUCCEED ON THE MERITS.

### A.   The Rubio Determination and the Policy are retaliatory, viewpoint discriminatory, and void for vagueness.

#### 1.   The Rubio Determination is retaliatory in violation of the First Amendment.

To succeed on his First Amendment retaliation claim, Mr. Khalil must show that: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting

*Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). Mr. Khalil is likely to demonstrate each of those elements here.

First, Mr. Khalil's expression lies at the core of what the First Amendment protects. Speech on matters of "public concern is at the heart of the First Amendment[]" and is entitled to "special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011). Similarly, "[s]peech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).

Here, Mr. Khalil's speech advocating for Palestinian rights plainly relates to a matter of grave and widespread "public concern" in the United States. *See supra* p. 2-3. In addition, Mr. Khalil's expressive activities are openly critical of the devastating human toll from Israel's military assault on Gaza and the U.S. support for Israel's actions. *See id*. Because this "speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections *is at its zenith*.'" *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (emphasis in original) (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425, (1988)), *cert. granted, judgment vacated on other grounds sub nom. Pham v. Ragbir*, 141 S. Ct. 227 (2020).

That Mr. Khalil is not a citizen does not change this analysis. As the Second Circuit held in *Ragbir*, the speech of a noncitizen on an issue central to "current political debate among American citizens and other residents" lies "'at the heart of First Amendment protection' and 'occupies the highest rung of the hierarchy of First Amendment values.'" 923 F.3d at 69–70 (cleaned up and quoting *Snyder*, 562 U.S. at 451–52). "Freedom of speech and press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). *See also, e.g.*, *Parcham v. INS*, 769 F.2d 1001, 1004 (4th Cir. 1985) ("It has long been held that aliens residing

in this country enjoy the protection of the First Amendment," including "the right to peaceful expression of views through public demonstration.").

Indeed, *Bridges v. Wixon* is instructive. In that case, an immigrant from Australia was placed in proceedings on the basis of being in "sympathy" with, "affiliated with," or distributing "printed matter" on a subject disfavored by the government—advancing the goals of Communists. 326 U.S. at 137–138, 142. The Supreme Court declined to apply a predecessor immigration statute in a way that would run up against First Amendment limits. *See id.* at 148.

As for the second factor, the public statements of government officials confirm that the Rubio Determination was at least "substantially caused by," and likely entirely "motivated by," *Smith*, 782 F.3d at 100, their disagreement with his protected speech. "It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995)). "Such discrimination based on viewpoint is an egregious form of content discrimination, which is presumptively unconstitutional." *Id.* (cleaned up).

Here, the Administration has clearly stated that it is targeting Mr. Khalil's constitutionally protected speech, not unlawful conduct. The government has argued that Mr. Khalil's presence undercuts U.S. foreign policy interests because, in the government's view, he is a "Hamas sympathizer" and has uttered "pro-Hamas" speech, and "participated in pro-jihadist protests." *See* Am. Pet. ¶¶ 31, 36, 73. Then-Senator Marco Rubio first publicly suggested what would become the challenged Policy on October 15, 2023. He characterized individuals "marching at universities, and in the streets of our country… calling for intifada, celebrating what Hamas has done, justifying what Hamas has done" as "supporters of Hamas" and argued that those on visas "need to go." *Id.*

¶ 33 n.6.[11] And the President himself made clear in public statements and through multiple Executive Orders that he intended to weaponize the country's immigration laws against noncitizens who participated in pro-Palestine campus protests. *Id*. ¶¶ 34–36.[12]

Mr. Khalil, who was at times the public face of the protests at Columbia as a lead student negotiator, *Id*. at ¶ 24, was an obvious target. And the record here confirms that Mr. Khalil's "public expression" of his support for Palestinian rights, "and its prominence, played a significant role" in the government's decision to target him for removal. *Ragbir*, 923 F.3d at 1. Secretary Rubio met with activists critical of Mr. Khalil's speech, and who specifically sought Mr. Khalil's deportation, just days before he issued his Determination. *Id*. at ¶ 42.[13] And after issuing the Rubio Determination, Secretary Rubio, high-level government officials, and the President himself repeatedly confirmed that they had taken this action against Mr. Khalil *specifically because of* his protected speech advocating for Palestinian rights and pursuant to a policy of targeting that speech. *Id*. at ¶ 73 (stating "the Trump administration will not tolerate" what he characterized as Mr. Khalil's "anti-American" activities); ¶¶ 74–80 ("if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out.")[14]; ¶ 81.

The government's statement also made clear that it had targeted Mr. Khalil as part of a broader policy of weaponizing immigration law to suppress protected pro-Palestine speech. After

---

[11] *Also available at*: https://perma.cc/L3MD-L5XL.

[12] *Also available at* https://perma.cc/2BYW-9G84. These executive orders adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* Exec. Order 13899, *Combating Anti-Semitism*, 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis"); Exec. Order 14188, *Additional Measures to Combat Anti-Semitism,* 90 Fed. Reg. 8847 (Jan. 29, 2025). A district court has found that public universities' incorporation of this specific definition of antisemitism in its speech policies constitutes impermissible viewpoint discrimination in violation of First Amendment. *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 2024 WL 4631301, at *10 (W.D. Tex. Oct. 28, 2024).

[13] *Also available at:* https://perma.cc/Q7DK-L6U7.

[14] *Also available at* https://perma.cc/3Q5E-WB6C.

President Trump posted that Mr. Khalil's arrest was "the first of many to come," Am. Pet. ¶ 73,[15] Deputy Secretary of DHS Edgar expanded on the president's promise, indicating the government will not grant visas of pro-Palestine noncitizen students who intend to "go and protest."[16]

Finally, with respect to the third factor in the retaliation analysis, the Rubio Determination has caused, and continues to cause, Mr. Khalil harm in multiple ways. As an initial matter, it places Mr. Khalil's immigration status at risk, subjecting him to the possible loss of his ability to remain a lawful permanent resident and to removal. The Supreme Court has "long recognized" that deportation is "a particularly severe penalty" for lawful permanent residents. *Padilla v. Kentucky*, 559 U.S. 356, 365–66 (2010) (citing *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893)). And several courts, including the Second Circuit, have held specifically that the First Amendment protects noncitizens who are detained and threatened with deportation as a result of their protected speech. *See, e.g., Ragbir*, 923 F.3d 53 at 71–72; *see also, e.g., Bello-Reyes v. Gaynor*, 985 F.3d 696, 698 (9th Cir. 2021); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018).

Furthermore, the Rubio Determination, and the resulting threat of deportation, has a chilling effect on Mr. Khalil's speech—and that of many others. The First Amendment was designed "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). It reflects a "profound national commitment to the principle that debate on public issues"—including international law and human rights—"should be uninhibited, robust, and wide-open[.]" *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). Now, every noncitizen must wonder whether they will face retaliation for engaging in speech on issues of public concern or critical of the U.S. government— and given the government's willingness to misrepresent and caricature Mr. Khalil's views, must

---

[15] *Also available at* https://perma.cc/BML5-GR84.
[16] Salama Decl. Ex. C, *also available at* https://perma.cc/N6QY-4PWF.

worry that even the most innocuous statements can endanger their presence in the United States if they are in tension with powerful officials' strongly-held personal opinions. *See Ragbir*, 923 F.3d at 71 ("[T]o allow this retaliatory conduct to proceed would broadly chill protected speech, among not only [noncitizen] activists . . . but also . . . citizens and other residents."). If the Rubio Determination has its intended effect, it will prevent Mr. Khalil—and many others—from speaking in this country at all.

Additionally, the Rubio Determination has irretrievably damaged Mr. Khalil's reputation by baselessly identifying him as a threat to the foreign policy of the United States, marking him and his family as a target for harassment and notoriety. *See* Am. Pet. ¶¶ 73–81; Abdalla Decl. ¶¶ 28–29 (Mr. Khalil's 8-months-pregnant wife describing harassment directed at Mr. Khalil, her, and their extended family since the detention). The Supreme Court has criticized designations like the Rubio Determination, noting that such "condemnations and blacklists" should not be wielded "as a substitute for . . . legal types of penalties by courts following trial and conviction," *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 145 (1951) (Black, J., concurring), and condemning as "devoid of fundamental fairness" similar designations of "subversive" organizations and individuals, *id.* at 161 (Frankfurter, J., concurring).

Finally, the Rubio Determination is also the government's justification for Mr. Khalil's arrest and detention, which are themselves bases for severe ongoing harm. *See infra* Section I.B.

### 2. Respondents' Policy constitutes an unconstitutional, viewpoint-based restriction.

Mr. Khalil is also likely to prevail on his independent—but related—claim that Respondents' Policy of targeting noncitizens for removal on the Foreign Policy Ground based on First Amendment protected speech advocating for Palestinian rights constitutes an unconstitutional viewpoint-based restriction on speech. To the extent that the government argues that the Rubio

11

Determination stems from the Policy, that does not excuse the government's retaliation against Petitioner. It only emphasizes the extent to which the Policy itself violates the First Amendment.

As already discussed, *see supra* Section I.A.1, the government has announced its intention to engage in a viewpoint discriminatory scheme to arrest, detain, and seek to remove noncitizens who engage in constitutionally protected speech in the United States. While there has been intense political debate and protest on all sides regarding Israel's military actions in Gaza and their devastating human toll, the Administration is targeting only pro-Palestine speech for punishment. Mr. Khalil's arrest is a part of that scheme and intended to punish him for his past speech advocating for Palestinian rights, to silence his speech right now, and to suppress his future speech expressing the same views.

Respondents' Policy is textbook viewpoint discrimination. It "targets not subject matter, but particular views taken by speakers on a subject," *Rosenberger,* 515 U.S. at 829, and it does so "because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger*, 515 U.S. at 829). Such discrimination "is presumed to be unconstitutional.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 828). The government does not get to pick and choose which sides of an issue will be allowed a public hearing, and which will be punished or suppressed.

As discussed above, the fact that the Policy targets noncitizens does not immunize it from First Amendment challenge, because the First Amendment protects noncitizens against retaliatory detention and removal. *See Ragbir*, 923 F.3d at 69–70. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624,

642 (1943)). That principle applies with full force to government attempts to punish noncitizens in the country for their protected expression. The First Amendment freedoms of speech and press do not "acknowledge[] any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority." *Bridges*, 326 U.S. at 161 (Murphy, J., concurring).

Nor does the Administration's assertion of foreign policy concerns justify its explicitly viewpoint discriminatory scheme to punish and chill pro-Palestine speech throughout the country. *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995) (rejecting the proposition that the government's invocation of foreign policy deprives the courts of their "essential function in ensuring that aliens are not targeted by the INS in retaliation for exercising their acknowledged constitutional rights").[17] *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake."). If the government could justify the overt suppression of disfavored views with the magic words "foreign policy," a category that can be stretched to cover almost any issue of national (let alone international) concern, then noncitizens would be free to express only their enthusiastic support

---

[17] On appeal, the Supreme Court ultimately held in that 8 U.S.C. 1252(g) barred jurisdiction over the plaintiffs' selective prosecution claims. 525 U.S. 471 (1999). Section 1252(g) does not apply to Petitioner's claim for injunctive relief against the Policy or the Rubio Determination because he does not seek to enjoin any "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C. 1252(g), and rather challenges a Determination and Policy made by the Secretary of State, *see also Ragbir*, 923 F.3d at 63 (noting that 1252(g) does not apply to "many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation." (quoting *AADC*, 525 U.S. at 482)). Moreover, Section 1252(g) has no application to challenges to unlawful detention; rather, courts adjudicate such challenges under traditional First Amendment principles. *See Bello-Reyes*, 985 F.3d at 698. But even if Section 1225(g) applies, Mr. Khalil's claim for individual relief falls under the exception for "outrageous discrimination" for substantially the same reasons the Second Circuit identified in *Ragbir*: he is not in violation of any immigration laws, he is being retaliated against for his protected expression, he has a strong interest in avoiding selective detention and deportation, and the government's admission that he was targeted for the views he expressed obviates the need for any sensitive inquiry into the "real" reasons for Mr. Khalil's targeting for removal. *See* 923 F.3d at 69–73.

for the Administration and its policies—whether it comes to tariffs on U.S. allies, the war between Russia and Ukraine, or the annexation of Greenland and Canada. Such abuse of the Administration's removal powers to silence dissent and distort public debate in its favor would undermine the entire purpose of the First Amendment.[18]

The communicative impact of protected speech on foreign audiences is also not a legitimate ground for suppression. The fact that some people find speech uncomfortable, offensive, or upsetting does not diminish its protection under the First Amendment. The Supreme Court has "said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal*, 582 U.S. at 244 (quoting *Street v. New York,* 394 U.S. 576, 592, (1969)); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself hurtful or disagreeable."). Indeed, "a function of free speech under our system of government is to invite dispute" and it may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). The First Amendment therefore protects "even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 461. This protection extends to "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270.

The First Amendment's protection for controversial speech applies just as robustly to speech that offends foreign audiences, including foreign government officials, as speech that

---

[18] "[W]hen asked if it is only pro-Palestinian protesters who will have their visas revoked, [Secretary] Rubio said others' whose actions threaten the country's foreign policy interests will be subject to deportation." *See* Friedman, *supra* n.10.

offends domestic ones. *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("[W]e have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment'. . . . We are not persuaded that the differences between foreign officials and American citizens require us to deviate from these principles here." (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988))). The First Amendment's protections for free expression are well-known the world over, and foreign audiences are not likely to mistake the government's constitutionally compelled tolerance of dissent for endorsement of the views expressed by dissidents. *See Widmar v. Vincent*, 454 U.S. 263, 271 n.10 (1981) ("[B]y creating a forum the University does not thereby endorse or promote any of the particular ideas aired there. Undoubtedly many views are advocated in the forum with which the University desires no association.").

### 3. The Policy and Determination as to Petitioner are void for vagueness.

Mr. Khalil is also likely to succeed on his claim that the challenged Policy does not satisfy due process because it is void for vagueness. The Policy, including as-applied to Mr. Khalil, does not give the proper notice to anyone residing in the country which of their otherwise-lawful speech, opinions, beliefs, or advocacy will result in the government targeting them for detention and removal, and it provides government officials with unfettered discretion to target disfavored speech. Indeed, it is still unclear which exactly of Mr. Khalil's past statements or expressive activity resulted in the Rubio Determination and led to his detention.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of* Rockford, 408 U.S. 104, 108 (1972). A policy can be vague for two independent reasons: if the government fails to "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or if it would "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v.*

15

*Morales*, 527 U.S. 41, 56 (1999). When acts affecting speech are involved, particularly "rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–55 (2012). And the requirement for rigorous scrutiny is only heightened where a law or policy carries serious penalties. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (noting that the "severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."). Because removal from the United States is "a particularly severe penalty," *Lee v. United States*, 582 U.S. 357, 370 (2017) (quoting *Padilla*, 559 U.S. at 365), the Policy of deporting noncitizens for pro-Palestine speech must satisfy the most exacting vagueness standard. It cannot.

First, the Policy as stated by the White House, the Secretary of State, and various DHS officials is too vague to give noncitizens living in the country fair notice of what speech will cause the Administration to arrest, detain, and seek to remove them. Respondent Rubio has stated that he plans to apply the Foreign Policy Ground to any "Hamas supporters in America so they can be deported."[19] But he has given no definition of who might qualify as a so-called "Hamas supporter"[20] and, based on the facts of this case, it appears that any prominent advocate for Palestinians' dignity and their right to live, and any vocal critic of Israeli or U.S. policy towards Palestinians, would fit the description in Respondent Rubio's view. Moreover, the Administration's various other statements have provided no greater clarity about what constitutes

---

[19] @marcorubio, X (Mar. 9, 2025, 6:10 PM), https://perma.cc/6EPU-6WP4.

[20] Even advocacy explicitly supporting Hamas— a designated foreign terrorist organization that Mr. Khalil neither supports nor associates with—would be protected under the First Amendment, so long as it is not coordinated with Hamas. *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th Cir. 2002) (explaining that under the material support for terrorism statute, individuals "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas"); *accord Holder*, 561 U.S. at 39 ("[W]e in no way suggest that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations.").

proscribed "pro-Hamas" speech or beliefs. Indeed, when asked by NPR to provide any specifics on what would constitute a deportable offense under the Policy, the Deputy Secretary of DHS could give no answer beyond indicating an objection to continued presence of noncitizens who seek to engage in "protest." *See* Salama Decl., Ex. C.

Nor is the specific Determination of how the Policy applies to Petitioner any more clear. As discussed *supra*, *see* Section I.A.1, official statements from DHS merely assert that Mr. Khalil "led activities aligned to Hamas," and in "support" of Hamas, without any clarity on what those activities were, or what these terms mean.[21]

None of these explanations provide sufficient standards to satisfy due process. The words "support" and "alignment" are expansive and highly subjective. Does mere presence at a protest in support of Palestinian human rights qualify for the Administration's definition of support or of engaging in protest? Does publicly criticizing the actions of Israel's military in Gaza amount to "alignment" with Hamas because it may overlap with the organization's ideological opinions? What about engaging in scholarship about the history of Palestine?

Multiple courts have recognized that terms akin to "support" are susceptible to a "wide range of meanings depending on context." *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) (prohibition on "encourage[ing]" or "promot[ing]" a riot was overbroad)[22]; *see also United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021) (same, explaining that "encourage" and "promote" could mean "to recommend, advise"), *cert denied*, 142 S. Ct. 865 (2022); *Rosenberger* 515 U.S. at 836 (emphasizing "vast potential reach" of term "promote[]"). Such broad language

---

[21] @DHSgov, X (Mar. 9, 2025, 9:29 PM), https://perma.cc/2BYW-9G84; https://perma.cc/6EPU-6WP4; Salama Decl. Ex. D, Jake Offenhartz, *Immigration Agents Arrest Palestinian Activist Who Helped Lead Columbia University Protests*, Associated Press (Mar. 9, 2025) https://perma.cc/HPH9-T2SV.

[22] Because the court found those statutory terms overbroad, it had no occasion to resolve whether they were also unconstitutionally vague. *Miselis*, 972 F.3d at 546.

sweeps across a range of constitutionally protected speech and activities, making it impossible for individuals to know how penalties will be enforced. *See United States v. Loy*, 237 F.3d 251, 264–65 (3d Cir. 2001) (explaining that where individuals can "hardly be expected to discern, in advance, which [speech is] prohibited," a policy risks "chill[ing] protected conduct" and is therefore unconstitutionally vague").

In contrast, where courts have rejected vagueness challenges, it is because the elements of the challenged policy are clearly defined and so provide adequate ex ante notice for their application. In *Arriaga v. Mukasey*, the Second Circuit rejected a petitioner's argument that a provision of the INA rendering individuals convicted of stalking deportable was vague as applied. 521 F.3d 219 (2d Cir. 2008). In reaching its decision, the court emphasized that "virtually every state" has codified stalking as a criminal offense with distinct elements, incorporating a scienter requirement. *Id.* at 226. The provision of the INA was not vague as applied to the petitioner, because he had been convicted of stalking under state law. *Id.* at 227. In contrast, here, the Policy of commencing immigration proceedings against individuals who are "aligned to Hamas" or "pro-Hamas" is not tied to any clarifying definitions in the INA, much less in underlying criminal statutes with distinct elements, and thus risks chilling (or is actually meant to chill) all manner of protected speech and so is void for vagueness.

Second, the Policy is also unconstitutionally vague for the separate reason that it permits arbitrary and discriminatory enforcement and has been arbitrarily and discriminatorily applied to Mr. Khalil. That is because the Policy relies on subjective determinations about whether speech is sufficiently "pro-Hamas" or "aligned to" Hamas or "sympathetic to" Hamas. The problem of subjectivity is exacerbated by the fact that the Policy itself encompasses constitutionally protected speech. A law or policy that "reaches 'a substantial amount of innocent conduct' confers an

18

impermissible degree of discretion on law enforcement authorities to determine who is subject to the law." *Arriaga*, 521 F.3d at 228 (quoting *Morales*, 527 U.S. at 60–61). In the case of the Policy, one official might consider constitutionally protected speech in favor of Palestinian rights to be "pro-Hamas" while another official might consider the same speech not to be a sufficient basis for immigration consequences. This is a far cry from a policy or law for which there are objective standards limiting officials' discretion to commence proceedings. *Cf Arriaga*, 521 F.3d at 228 (provision of the INA instructing removal of individuals convicted of stalking provided adequate limits on enforcement because it did not enable discretionary application).

Indeed, "[s]tandards provide the guideposts that check the [official]"; without them, "*post hoc* rationalizations . . . and the use of shifting or illegitimate criteria are far too easy[.]" *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988). But the Policy contains no objective standards, not even a requirement of scienter, to guide an official in understanding when immigration consequences should be triggered by speech. And because the Rubio Determination with respect to Mr. Khalil's speech is similarly standardless, it is also unconstitutionally vague.

**B. Mr. Khalil's retaliatory detention violates due process and the First Amendment.**

Mr. Khalil is also likely to succeed on his claim that his detention violates his due process rights. "[T]he Fifth Amendment entitles noncitizens to due process in removal proceedings," including in detention incident to those proceedings. *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Immigration detention is civil and must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" so that it remains "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (cleaned up). There are only two legitimate purposes for immigration detention: mitigating flight risk and preventing danger to the community. *See Demore v. Kim,* 538 U.S. 510, 531 (2003)

19

(Kennedy, J., concurring); *Zadvydas*, 533 U.S. at 690; *Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2020). Neither purpose is served by Mr. Khalil's detention.

Mr. Khalil is not a flight risk. He is married to a U.S. citizen who lives in New York City and is pregnant with their first child (who will be born a U.S. citizen). Am. Pet. ¶¶ 1, 3. And he is a Lawful Permanent Resident with no criminal history. *Id.* As such, his detention bears no "reasonable relation" to a legitimate government purpose and is unlawful. *Zadvydas*, 533 U.S. at 690; *see also Faure v. Decker*, No. 15-cv-5128, 2015 WL 6143801, at *3 (S.D.N.Y. Oct. 19, 2015) (ordering release or a bond hearing where there was "no evidence" that the habeas petitioner "poses a danger to the public or would flee during the pendency of the removal proceedings").

Not only does the government lack a legitimate purpose in Mr. Khalil's detention, but it is clearly detaining him for patently *illegitimate* reasons: to punish him for his speech. But civil detention cannot be a "mechanism for retribution," *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (cleaned up), because "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives," *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20 (1979) (cleaned up). Mr. Khalil's detention in rural Louisiana—thousands of miles away from his attorneys, family, and community, Am. Pet. ¶¶ 73–81—is intended as retaliatory punishment for his expressive activity in support of Palestinian rights, *see City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Because he is subject to "discretionary detention" pursuant to 8 U.S.C. § 1226(a), Joyce Decl., ECF 32, at ¶ 7, ICE may release him during the pendency of proceedings, *see Velasco Lopez*, 978 F.3d at 848. But Respondents have *chosen* to detain Mr. Khalil to advance their punitive purpose.

Further, the government's statements make clear that it is detaining Mr. Khalil to prevent his current and future speech on a matter of great public concern, and to deter other noncitizens from doing the same. The government specifically linked its decision to *detain* Mr. Khalil to his expressive activity. President Trump posted that "ICE proudly *apprehended and detained*" Mr. Khalil because of his supposedly "[r]adical" protest activities and warned that "[t]his is the first *arrest* of many to come." Am. Pet. ¶ 73 (emphasis added). The White House likewise trumpeted that Mr. Khalil had been "ARRESTED BY ICE." Am. Pet. ¶ 74. DHS itself similarly connected the fact that ICE had "*arrested* Mahmoud Khalil" to his supposed "activities aligned to Hamas." *Supra* n.21.

This unlawful detention necessarily results in injury to Mr. Khalil. *See infra* Section II; *Barker v. Wingo*, 407 U.S. 514, 532 (1972) (detention has a "serious" "detrimental impact on the individual"); *Sessions*, 872 F.3d at 994 (unconstitutional detention is irreparable harm). He is being detained thousands of miles away from his family and attorneys, in a detention facility known for systemic rights violations, including excessive force by guards and sexual assault.[23] *See also Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (finding retaliation where detainee was "transferred to a distant prison where his family could not visit him regularly"). His detention is sure to result in economic injury as he will be unable to start his new job as scheduled next month, and may lose his employment altogether, if not released. Abdalla Decl. ¶¶ 26–27; Am. Pet. ¶ 71.

Further, Mr. Khalil's detention is intended to chill his current and future speech. *See supra* Section I.A.1. The government's detention of Mr. Khalil—in rural Louisiana, to boot, away from his university and community—quite literally prevents him from continuing to speak

---

[23] ACLU et. al, *Inside the Black Hole: Systemic Human Rights Abuses Against Immigrants Detained & Disappeared in Louisiana*, Aug. 2024, 17; 50–51, available at https://perma.cc/HT6Z-SRCY.

in support of Palestinian rights. It also deprives the public of being able to hear from him, and chills others—especially noncitizens—from expressing similar views.

## II. PETITIONER FACES IRREPARABLE HARM ABSENT AN INJUNCTION.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221–22 (S.D.N.Y. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). There is no question that Mr. Khalil will suffer enormous irreparable harm absent a preliminary injunction, including through the violation of his First and Fifth Amendment rights, the silencing of his deeply held beliefs, lack of meaningful access to counsel and this Court, disruption in his medical care, loss of future employment, separation from his U.S. citizen wife, and the prospect of missing the birth of his first child.

The deprivation of Mr. Khalil's First and Fifth Amendment rights is itself enough to constitute irreparable harm. Even "the *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original) (applying this principle to Eighth Amendment and religious freedom claims). And "[i]t is well established that the 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Kamerling v. Massanari*, 295 F.3d 206, 214–15 (2d Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In cases involving specific, direct restrictions on speech, "the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003).

Here, the very purpose of Mr. Khalil's arrest, detention and pending removal is to silence, restrict, and chill, his protected speech, now and in the future—and to send a message to other would-be protesters. In the past, Mr. Khalil has expressed his views on Palestine by helping to

organize educational events and lectures, participating in interviews with national and international media outlets, and advocacy in international organizations, universities, and other spaces of influence. Am. Pet. ¶¶ 23–27. Every day he is confined in an immigration detention facility under threat of deportation, Mr. Khalil's expressive activities are at best severely restricted, if not completely extinguished. Through his detention, he is prevented from speaking freely and openly—the very retaliatory and punitive harm he is challenging in this litigation.

In addition to the loss of his First Amendment rights, Mr. Khalil faces irreparable injury to his liberty by continued unconstitutional and unlawful detention. "'Several courts in this circuit have,' quite properly I would add, 'concluded that the deprivation of an alien's liberty is, in and of itself, irreparable harm.'" *Velesaca v. Decker*, 458 F. Supp. 3d 224, 240–41 (S.D.N.Y. 2020) (quoting *Sajous v. Decker*, 18-CV-2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2013)); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) ("Any amount of actual jail time is significant[] and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." (alterations, citations, and internal quotation marks omitted)).

Mr. Khalil's isolation from his eight-months pregnant wife just weeks before the birth of their first child, his community, and the start of his employment has resulted in enormous hardship, further constituting irreparable harm. *See Jimenez v. Napolitano*, No. C-12-03558, 2012 WL 3144026, at *7 (N.D. Cal. Aug. 1, 2012) (finding separation from family members, among other things, to constitute irreparable harm); *Borjas-Calix v. Sessions*, No. 16-CV-685, 2017 WL 1491629, at *3 (D. Ariz. Apr. 26, 2017) (finding plaintiff in detention would experience irreparable harm, including "separation from family and loss of employment"). Mr. Khalil continues to face overwhelming emotional distress being unable to see or attend to his eight-months pregnant wife,

who herself experiences the painful toll of being forcibly separated from her husband. Mr. Khalil's distress is further exacerbated by the prospect of losing his impending employment and health insurance for his wife and expected child mere weeks before birth, and the agony of potentially missing the birth of their first child and being unable to support them at such a critical time.

## III. THE EQUITIES WEIGH HEAVILY IN THE PETITIONER'S FAVOR AND A PRELMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST.

"Where the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. Mar. 27, 2020). Here, the balance of hardships overwhelmingly favors Mr. Khalil. He, as well as the greater U.S. population, face enormous irreparable injury if an injunction is not granted. Conversely, the government can make no plausible claim to harm from an injunction.

The public interest is "best served by ensuring the constitutional rights of persons within the United States are upheld." *Id.* (quoting *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018)); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018). In *L.V.M.*, the court preliminarily enjoined an unlawful policy that prevented the release of immigrant minors in federal custody, and in considering the equities it held that "this Court is hard-pressed to see how setting aside [the challenged policy] could be against the public interest," since "[o]bviously, [the government] cannot suffer any harm from an injunction that terminates an unlawful practice." *Id.* at 620. Here, too, where the strength of the constitutional claims and injuries are so paramount, the public interest is served by the relief sought.

Beyond the public's interest in ensuring detention is justified, which weighs overwhelmingly in favor of granting the requested injunction, courts routinely emphasize that "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v.*

*Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Where suppression of speech is at issue, the government action "harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012). Here, absent injunctive relief, the government will continue to unjustifiably chill speech and subject individuals to the threat of detention and deportation for exercising their bedrock constitutional rights. The public interest weighs heavily in favor of an injunction against the government's excessively retaliatory and unconstitutional aims of suppressing the protected expression of U.S. residents on a viewpoint discriminatory basis.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court issue an order that (1) preliminarily releases Mr. Khalil; (2) preliminarily enjoins Respondent Rubio's determination that the INA's "Foreign Policy Ground" applies to him; and (3) preliminarily enjoins Respondents from enforcing their Policy of targeting for detention and removal noncitizens who engage in constitutionally protected expressive activity in the United States in support of Palestinian rights or critical of Israel.

Dated: March 17, 2025                                          Respectfully submitted,

New York, NY

*/s/   Robert Hodgson*

NEW YORK CIVIL LIBERTIES UNION          AMERICAN CIVIL LIBERTIES UNION
FOUNDATION                                               FOUNDATION
Amy Belsher                                                Omar Jadwat
Robert Hodgson                                           Noor Zafar
Veronica Salama                                          Sidra Mahfooz*
Molly Biklen                                               Brian Hauss
125 Broad Street, 19th Floor                         Brett Max Kaufman
New York, N.Y. 10004                                  Esha Bhandari
Tel: (212) 607-3300                                     Vera Eidelman
abelsher@nyclu.org                                     Tyler Takemoto*

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
Ramzi Kassem
Naz Ahmad
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
Tel: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu

DRATEL & LEWIS
Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Tel: (212)732-8805
Fax: (212) 571-3792
agreer@dratellewis.com

125 Broad Street, Floor 18
New York, NY 10004
Tel: (212) 549-2500
ojadwat@aclu.org
*Application for admission* pro hac vice
*forthcoming*

CENTER FOR CONSTITUTIONAL RIGHTS
Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

WASHINGTON SQUARE LEGAL SERVICES, INC.
IMMIGRANT RIGHTS CLINIC
Alina Das, ESQ.
245 Sullivan Street, 5th Floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu

*Counsels for Petitioner*